HANRAHAN ET AL. *v.* HAMPTON ET AL.

No. 79–912. Decided June 2, 1980*

PER CURIAM.

In the Civil Rights Attorney's Fees Awards Act of 1976, Congress amended 42 U. S. C. § 1988 to permit the award of a reasonable attorney's fee to the "prevailing party" as part of the taxable costs in a suit brought under any of several specified civil rights statutes. The respondents brought suit

---

*Together with No. 79–914, *Johnson et al.* v. *Hampton et al.,* also on certiorari to the same court.

under three of those statutes in the United States District Court for the Northern District of Illinois, alleging that their constitutional rights had been violated by the petitioners, and seeking money damages from them.[1] The District Court directed verdicts for the petitioners, but the Court of Appeals reversed and remanded the case to the District Court for a new trial, 600 F. 2d 600. The Court of Appeals also awarded to the respondents their costs on appeal, including attorney's fees which it believed to be authorized by § 1988. *Id.*, at 643–644.[2]

The final sentence of § 1988, as amended, provides as follows:

"In any action or proceeding to enforce a provision of

---

[1] The controversy arose from the execution in 1969 of a judicial warrant to search for and seize illegal weapons within an apartment in Chicago occupied by nine members of the Black Panther Party. In the course of the search two of the apartment's occupants were killed by gunfire, and four others were wounded. The police seized various weapons and arrested the seven surviving occupants of the apartment. The survivors were indicted by a state grand jury on charges of attempted murder and aggravated battery, but the indictments ultimately were dismissed. Those seven persons and the legal representatives of the two persons killed are the respondents in these cases. Named as defendants in the respondents' suits were Cook County, the city of Chicago, and various state and local officials allegedly involved in the search or its aftermath. Those officials are the petitioners in No. 79–912. After proceedings in the District Court and the Court of Appeals resulted in the dismissal of the complaint against the city and the county, see *Hampton* v. *Chicago*, 339 F. Supp. 695 (ND Ill. 1972), aff'd in part and rev'd in part, 484 F. 2d 602 (CA7 1973), the respondents filed an amended complaint naming as additional defendants the three Federal Bureau of Investigation agents and an informant who are the petitioners in No. 79–914.

The respondents based their claims on 42 U. S. C. §§ 1983, 1985 (3) (1976 ed., Supp. II), and 1986, and on provisions of the Constitution. They also alleged various causes of action under state law.

[2] In an unpublished supplemental opinion issued on December 12, 1979 (as amended December 21, 1979), fixing the amount of the fee award, the Court of Appeals reiterated its conclusion that the respondents were "prevailing parties" within the meaning of 42 U. S. C. § 1988.

sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U. S. C. § 1988.

The statute by its terms thus permits the award of attorney's fees only to a "prevailing party." Accordingly, in the present cases, the Court of Appeals was authorized to award to the respondents the attorney's fees attributable to their appeal only if, by reason of obtaining a partial reversal of the trial court's judgment, they "prevailed" within the meaning of § 1988. The Court of Appeals believed that they had prevailed with respect to the appeal in this case,[3] resting its conclusion upon the following appellate rulings favorable to the respondents: (1) the reversal of the District Court's judgment directing verdicts against them, save with respect to certain of the defendants; (2) the reversal of the District Court's denial of their motion to discover the identity of an informant; and (3) the direction to the District Court on remand to consider allowing further discovery, and to conduct a hearing on the respondents' contention that the conduct of some of the petitioners in response to the trial court's discovery orders warranted the imposition of sanctions under Federal Rule of Civil Procedure 37 (b)(2). While the respondents did prevail on these matters in the sense that the Court of Appeals overturned several rulings against them by the District Court, they were not, we have concluded, "prevailing" parties in the sense intended by 42 U. S. C. § 1988, as amended.

The legislative history of the Civil Rights Attorney's Fees Awards Act of 1976 indicates that a person may in some circumstances be a "prevailing party" without having obtained a

---

[3] The Court of Appeals recognized that the respondents had not "prevailed" in the District Court, and for that reason limited the award of counsel fees to those incurred by the respondents in the course of the appeal. 600 F. 2d 600, 643–644.

favorable "final judgment following a full trial on the merits," H. R. Rep. No. 94–1558, p. 7 (1976). See also S. Rep. No. 94–1011, p. 5 (1976). Thus, for example, "parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief," *ibid.* See also H. R. Rep. No. 94–1558, *supra,* at 7, and cases cited; *Dawson* v. *Pastrick,* 600 F. 2d 70, 78 (CA7 1979); *Nadeau* v. *Helgemoe,* 581 F. 2d 275, 279–281 (CA1 1978).

It is evident also that Congress contemplated the award of fees *pendente lite* in some cases. S. Rep. No. 94–1011, *supra,* at 5; H. R. Rep. No. 94–1558, *supra,* at 7–8. But it seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal. The congressional Committee Reports described what were considered to be appropriate circumstances for such an award by reference to two cases— *Bradley* v. *Richmond School Board,* 416 U. S. 696 (1974), and *Mills* v. *Electric Auto-Lite Co.,* 396 U. S. 375 (1970). S. Rep. No. 94–1011, *supra,* at 5; H. R. Rep. No. 94–1558, *supra,* at 8. In each of those cases the party to whom fees were awarded had established the liability of the opposing party, although final remedial orders had not been entered. The House Committee Report, moreover, approved the standard suggested by this Court in *Bradley,* that " 'the entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an award of counsel fees . . . ,' " H. R. Rep. No. 94–1558, *supra,* at 8, quoting *Bradley* v. *Richmond School Board, supra,* at 723, n. 28. Similarly, the Senate Committee Report explained that the award of counsel fees *pendente lite* would be "especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on *all* issues." S. Rep. No. 94–1011, *supra,* at 5 (emphasis added). It seems apparent from these pas-

sages that Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims. For only in that event has there been a determination of the "substantial rights of the parties," which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney.[4]

The respondents have of course not prevailed on the merits of any of their claims. The Court of Appeals held only that the respondents were entitled to a trial of their cause.[5] As a practical matter they are in a position no different from that

---

[4] The provision for counsel fees in § 1988 was patterned upon the attorney's fees provisions contained in Titles II and VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000a–3 (b) and 2000e–5 (k), and § 402 of the Voting Rights Act Amendments of 1975, 42 U. S. C. § 1973*l* (e). S. Rep. No. 94–1011, p. 2 (1976); H. R. Rep. No. 94–1558, p. 5 (1976). Those provisions have been construed by the Courts of Appeals to permit the award of counsel fees only to a party who has prevailed on the merits of a claim. See *Bly* v. *McLeod*, 605 F. 2d 134, 137 (CA4 1979) (Voting Rights Act); *Chinese for Affirmative Action* v. *Leguennec*, 580 F. 2d 1006, 1009 (CA9 1978) (same); *Grubbs* v. *Butz*, 179 U. S. App. D. C. 18, 20–21, 548 F. 2d 973, 975–976 (1976) (Title VII); *Sperling* v. *United States*, 515 F. 2d 465, 485 (CA3 1975) (same). See also *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 418 (1978) ("[W]hen a district court awards counsel fees [under the Civil Rights Act of 1964] to a prevailing plaintiff, it is awarding them against a violator of federal law"). But cf. *Van Hoomissen* v. *Xerox Corp.*, 503 F. 2d 1131, 1133 (CA9 1974).

In the cases cited by the Court of Appeals to justify the award of counsel fees in these cases, those to whom fees were awarded had prevailed on the merits of at least some of their claims. See *Davis* v. *Murphy*, 587 F. 2d 362, 363–364 (CA7 1978); *Nadeau* v. *Helgemoe*, 581 F. 2d 275, 279–281 (CA1 1978); *Wharton* v. *Knefel*, 562 F. 2d 550, 556 (CA8 1977).

[5] The Court of Appeals stated that, in reversing the directed verdicts, it was "not passing on the ultimate validity of [the respondents'] claims," 600 F. 2d, at 621, n. 20. Indeed, Chief Judge Fairchild emphasized in his concurring opinion that the court's use of the phrase " 'prima facie' case" in referring to the evidence adduced by the respondents should not be taken to mean that at "any stage of this case . . . the evidence compelled a verdict for [the respondents] unless rebutted." *Id.*, at 648.

they would have occupied if they had simply defeated the defendants' motion for a directed verdict in the trial court. The jury may or may not decide some or all of the issues in favor of the respondents. If the jury should not do so on remand in these cases, it could not seriously be contended that the respondents had prevailed. See *Swietlowich* v. *Bucks County*, 620 F. 2d 33, 34 (CA3 1980). Nor may they fairly be said to have "prevailed" by reason of the Court of Appeals' other interlocutory dispositions, which affected only the extent of discovery. As is true of other procedural or evidentiary rulings, these determinations may affect the disposition on the merits, but were themselves not matters on which a party could "prevail" for purposes of shifting his counsel fees to the opposing party under § 1988. See *Bly* v. *McLeod*, 605 F. 2d 134, 137 (CA4 1979).

The motion of Fraternal Order of Police of the State of Illinois in case No. 79–912 for leave to file a brief, as *amicus curiae*, is granted.

The respondents' motions for leave to proceed *in forma pauperis* are granted, the petitions for certiorari are granted, limited to the question of the propriety of the award of attorney's fees by the Court of Appeals, and the judgment is reversed insofar as it awarded attorney's fees to the respondents. In all other respects, the petitions for certiorari are denied.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I join the Court's opinion insofar as it reverses the award of attorney's fees entered by the Court of Appeals for the Seventh Circuit. As I would grant the petition filed by the

federal defendants in its entirety, I dissent from the denial of certiorari in No. 79–914.[1]

## I

This civil litigation arose in the aftermath of a 1969 police raid on a Chicago apartment occupied by nine members of the Black Panther Party, two of whom were killed. The surviving occupants of the apartment and the legal representatives of the deceased Black Panthers filed four actions for damages, now consolidated, against 28 state and federal law enforcement officials. The complaints allege numerous violations of constitutional rights. In particular, the plaintiffs claim that three agents assigned to the Federal Bureau of Investigation's Chicago office and an informant working with them (the federal defendants) conspired with state officers to carry out the operation, to conceal its allegedly sinister nature, and to harass the plaintiffs with unfounded prosecutions.

The jury trial lasted 18 months, generating a 37,000-page transcript and masses of documentary evidence. At the close of the plaintiffs' case, some 16 months after trial began, the District Court granted directed verdicts in favor of the federal and most of the state defendants. Trial continued as to the police officers who actually participated in the apartment incident. Ultimately, the jury deadlocked and the District Court entered a final judgment directing verdicts in favor of all of the defendants. A divided panel of the Court of Appeals vacated the judgment and ordered a new trial as to all but four of the defendants.

I have not reviewed the entire record of what is said to have been "the longest case tried to a jury in the history of the United States judiciary." Memorandum of District Court, App. to Pet. for Cert. in No. 79–914, p. 175a. I have, how-

---

[1] I confine this dissent to the federal defendants, although it is not clear that the Court of Appeals properly reversed the directed verdicts as to many of the other defendants. See 600 F. 2d 600, 649 (1979) (Pell, J., dissenting in part).

ever, read with care the three separate opinions filed in the Court of Appeals as well as the District Court's extensive memorandum. Each judge agreed that the case against the federal defendants turns upon the sufficiency of the evidence regarding the alleged conspiracy.

At the close of the plaintiffs' case in chief, the District Court "reviewed all of the evidence . . . with all reasonable inferences that could be drawn therefrom, in the light most favorable to the plaintiffs." *Id.*, at 186a. The court found the record "devoid of proof of . . . participation [by the federal defendants] in a conspiratorial plan among themselves or with the state defendants. Thus no liability on their part existed and their motions for directed verdicts were granted." *Id.*, at 193a–194a. More specifically, the court explained:

> "Each of the Federal defendants was called by plaintiffs as adverse witnesses. Each testified extensively and denied knowledge or [*sic*], or participation in, a plan, or an agreement, or a conspiracy between themselves, or between them or any of them, and any and all of the State defendants to violate plaintiffs' constitutional and statutory rights through conduct of the search of the apartment, or prior thereto, or after the occurrence, or otherwise. Their denials were uncontradicted and unimpeached by any testimony whatsover." *Id.*, at 189a–190a.

Despite the explicit findings of the judge who presided over this 18-month trial, a majority of the Court of Appeals drew its own inferences and concluded that the evidence was sufficient to "warrant a jury determination of whether a conspiracy existed." 600 F. 2d 600, 621 (1979). The majority's lengthy opinion indicates that the court relied primarily, if not entirely, upon extensive testimony describing an FBI counterintelligence program directed against a number of organizations including the Black Panther Party.

There is no question that the FBI viewed that organization, which openly advocated armed resistance to authority and

had a documented record of violence,[2] as a serious threat to public safety and to the lives of law enforcement officers. But the issue at trial was not whether the FBI had a program designed to discredit the Black Panthers, or even whether the program had produced excesses. The only issue was whether these federal defendants conspired with state officers to conduct an unlawful search in which excessive force would be used or, subsequently, to harass the plaintiffs with malicious prosecutions. See *id.*, at 648–649 (Fairchild, C. J., concurring).

No one contends that any of the federal defendants took part in the raid itself. They did supply information to state officers about illegal firearms stored in the apartment. But each federal defendant testified that he did not know of and did not participate in any planning or joint activity regarding the operation at any time. This uncontradicted testimony was fully corroborated by the state defendants. In these circumstances, inferences drawn from a program not shown to have been related to the events in question are of dubious value. Judge Pell, dissenting in part in the Court of Appeals, viewed the matter as follows:

> "Going next to the . . . remaining state defendants and the federal defendants, I cannot agree that there was a basis for reasonable inferences that there was any kind of an agreement among them, express or implicit, to

---

[2] Summarizing evidence of record, Judge Pell's dissent described the party as an "extremist, paramilitary, uniformed organization. . . . It was a violent, revolutionary organization, which by party edict required its members to own and know how to use weapons and to have access to more than one weapon." *Id.*, at 654.

Judge Pell also noted that "Black Panther publications called for killing policemen," that the party "published a 'Destruction Kit' which described how to make and use incendiary bombs and other similar devices," that children attending its highly praised breakfast program were instructed to "Kill the Pigs," and that Black Panthers had "boasted" that one of their members had killed two Chicago police officers less than a month before the events at issue in this case. *Id.*, at 654–655.

cause a raid to be made with the object of killing or wounding various Black Panther Party members. It is true that at the time in question, the federal authorities thought it would be in the public good to neutralize the Black Panther Party so that it could not carry out its avowed purpose, among others, of killing policemen. Indeed, the idea perhaps could have been entertained by some, if not all, of those defendants who were engaged in law enforcement work that the community would be a safer place for law-abiding citizens to live and work in if Fred Hampton and his cohorts were not on the scene. This human feeling is far removed from a basis for an inference that they deliberately set a course to accomplish that by violence.

"In our jurisprudence a person cannot be convicted of a traffic offense unless proven guilty beyond a reasonable doubt. Even though the present case is of the civil variety, I cannot believe that the law should permit a determination that any person has deliberately planned a homicide on nothing more than speculative conjecture or mere suspicion. The hard basic reasonable inference-creating facts just did not exist in this case." *Id.*, at 660–661.

In the absence of positive evidence or "reasonable inference-creating facts," there was no reason to include the federal defendants in the remand for a second trial.

## II

This Court ordinarily leaves questions as to the sufficiency of evidence in a particular case to the courts below. But this is not ordinary litigation. Although it may appear on the surface to be an unexceptional civil rights suit for damages, the extraordinary magnitude of the litigation and the nature and scope of the evidence demonstrate that this lawsuit differs

from the civil damages actions to which our courts are accustomed.

Judge Pell observed that "this case has important overtones of unbridled denigrating attacks on governmental officials." *Id.*, at 666. The allegations of unconstitutional conduct by the state defendants are serious indeed, and I express no view on the merits of these claims. But the plaintiffs have a larger target: the Federal Bureau of Investigation. It is apparent that a basic trial strategy was to attack the FBI broadly. If there were sufficient relevant evidence to support the plaintiffs' claims, the law would require that they go to the jury regardless of underlying motive. Yet the presence of this collateral objective, related only tangentially if at all to the recovery of damages, imposed a special duty on the courts to bear in mind the admonition of *Butz* v. *Economou*, 438 U. S. 478, 508 (1978), that "federal officials [not be] harassed by frivolous lawsuits."

*Butz* rejected a claim that all highly placed federal officials should be absolutely immune from liability for civil rights violations. But federal officials, like state officials sued under 42 U. S. C. § 1983, have qualified immunity from suit. They therefore are liable only when they "discharge their duties in a way that is known to them to violate . . . a clearly established constitutional rule." 438 U. S., at 507. In *Butz*, we emphasized that absolute immunity is unnecessary to protect the public interest in "encouraging the vigorous exercise of official authority," *id.*, at 506, because qualified immunity shields officials from liability for good-faith mistakes. We predicted that such immunity would prove "workable," because "firm application of the Federal Rules of Civil Procedure" would permit "[i]nsubstantial lawsuits [to] be quickly terminated." In particular, "damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment. . . ." *Id.*, at 507–508. The District Court heeded this admonition.

In reversing that court, the Court of Appeals misappreciated the premises on which this Court rested its ruling in *Butz*. In *Butz*, we endeavored to accommodate two important societal objectives: to compensate persons injured by civil rights violations, and to do so without discouraging vigorous enforcement of the laws. The first objective impelled the Court to reject absolute in favor of qualified immunity for most officials. We recognized, however, that our decision would invite litigation in which constitutional claims easily are asserted. We therefore cautioned the judiciary to exercise their authority under the rules of procedure in order to protect official defendants from groundless claims. *Id.*, at 507.

Our concern in *Butz* was that extravagant charges might force officials to trial on claims that lacked a substantial basis in fact. In this case, there can be little speculation as to what evidence may be marshaled in support of the complaint. After 16 months of trial devoted exclusively to the plaintiffs' evidence, the trial court found the record wholly "devoid of proof of . . . participation" by the federal defendants in the conspiracy alleged. App. to Pet. for Cert. in No. 79–914, p. 193a. These defendants continue to assert that their conduct was a routine and good-faith effort at cooperative law enforcement. Neither the parties nor the courts below have identified concrete evidence to the contrary. If a new trial may be ordered in this case, similar allegations could survive properly supported motions for summary judgment on the basis of speculative inferences from unrelated evidence. The prospect of defending such lawsuits can hardly fail to "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949).

### III

The Court of Appeals' remand for a second trial as to the federal defendants in this case vitiates the protection we

sought to insure in *Butz*. The effect on legitimate law enforcement efforts could be serious. At the least, these officers' experience is likely to discourage other federal officials from cooperating with state law enforcement agencies over which they have no control. I would grant the petition for certiorari.

MR. JUSTICE MARSHALL, dissenting.

It is not clear to me that the award of attorney's fees in this case was in error because "respondents have of course not prevailed on the merits of any of their claims." *Ante,* at 758. The Court concedes that Congress in passing the Civil Rights Attorney's Fees Awards Act of 1976 contemplated the award of attorney's fees *pendente lite* in certain instances, and that a litigant may be a "prevailing party" for purposes of the Act without obtaining final judgment on the merits following a full trial. It is sufficient if there has been a determination of " 'substantial rights of the parties,' " *ante,* at 757, quoting H. R. Rep. No. 94–1558, p. 8 (1976).

In the instant case, respondents have been successful in obtaining reversal on appeal of a directed verdict entered against them. While this "only" means that respondents are entitled to a trial of their cause, *ante,* at 758, that is a major accomplishment which determines "substantial rights of the parties." Had petitioners been successful in defending their directed verdict on appeal, there is no doubt that they would be considered to have prevailed on the merits; the lawsuit would have been finished. Obtaining an appellate order requiring that a new trial be held after an action to enforce civil rights has been prematurely terminated similarly is an achievement reflecting on the merits of the case. The decision of the Court of Appeals, establishing that respondents produced sufficient evidence to warrant sending their case to the jury, breathes new life into an otherwise dead lawsuit. Without full briefing and oral argument, I am unable to

say that this does not fall within the category of legal victories which determine "substantial rights of the parties" for purposes of the Act.

In my view, the attorney's fees issue is sufficiently difficult to warrant the plenary attention of this Court rather than summary reversal.   Accordingly, I dissent.