**Jack Wayne FRIEND, et al., Plaintiffs–Appellees,**

v.

**Ronald KOLODZIECZAK, et al., Defendants–Appellants.**

**No. 90–16140.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1991.

Decided May 19, 1992.

Maureen C. Brooks and Richard Reynolds, Bennett, Samuelsen, Reynolds & Allard, Oakland, Cal., for defendants-appellants.

Sue Ochs, Law Offices of Amitai Schwartz, San Francisco, Cal., for plaintiffs-appellees.

Before: PREGERSON, FERGUSON, and O'SCANNLAIN, Circuit Judges.

PREGERSON, Circuit Judge:

■ This appeal presents the question whether the district court properly found appellees to be "prevailing parties" for an award of attorney's fees under 42 U.S.C. § 1988. We have jurisdiction to review the district court's decision under 28 U.S.C. § 1291. We affirm.

## BACKGROUND

A group of Roman Catholic jail inmates filed a class action suit against officials of Alameda County under 42 U.S.C. § 1983 alleging violations of their constitutional right to free exercise of religion. Jack Friend is the named class representative in this suit.

■ Some issues were settled before trial.[1] The only remaining free exercise claim at trial concerned the right of jail inmates to keep rosary beads and scapulars with them at all times.[2] The district court granted summary judgment in favor of the Alameda County officials. The court concluded that jail policy prohibiting religious articles in prisoners' cells was permissible under the *Turner* standard.[3] The court's

---

1. In their initial complaint, the inmates sought improved access to religion by way of private confessions and separate Roman Catholic services. This issue was resolved before trial.

2. Rosary beads are used to count prayers while praying. Scapulars are symbols of Mary, the mother of Jesus.

3. In *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), the Supreme Court stated that "when a prison regulation im-

order was, however, contingent upon submission by the officials of a revised prison manual setting forth prisoners' limited rights to possess religious articles.

## DISCUSSION

■ A district court may award attorney's fees to the prevailing party in an action brought under 42 U.S.C. § 1983. *Sablan v. Department of Fin.*, 856 F.2d 1317 (9th Cir.1988). We review the district court's finding of prevailing party status for clear error. *Lummi Indian Tribe v. Oltman*, 720 F.2d 1124, 1125 (9th Cir.1983); *Sablan*, 856 F.2d at 1324. "We must reverse, however, if the district court used incorrect legal standards to reach this finding." *Lummi Indian Tribe*, 720 F.2d at 1125.

■ As an initial matter, we note that a litigant need not succeed on every claim to qualify as the prevailing party. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Rather, a party may recover its attorney's fees if it "succeed[s] on any significant issue in liti-

gation which achieves some of the benefit ... sought in bringing suit." *Id.* (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)).[4] Moreover, the inmates may be considered prevailing parties even though they did not gain formal judicial relief. *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam); *Sablan*, 856 F.2d at 1324; *Muckleshoot Tribe v. Puget Sound Power & Light*, 875 F.2d 695, 696 (9th Cir.1989). In the present case, the district court concluded that the inmates prevailed because they succeeded either completely or partially on their free exercise claims. As the district court found, Alameda County officials took actions before trial that gave the inmates benefits they sought in filing suit. The inmates also benefited from the conditional summary judgment motion.

■ In the absence of formal relief, we focus on whether the inmates have "established a 'clear, *causal relationship* between the litigation brought and the practical outcome realized.'" *Sablan*, 856 F.2d at 1324 (quoting *Rutherford v. Pitchess*,

---

pinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Reasonableness is determined by a four-part test: (1) whether the regulation is rationally related to the legitimate government interest invoked to justify it; (2) whether the regulation leaves open an alternative way for prison inmates to exercise the right asserted; (3) the impact that accommodation of the asserted right will have on guards, other inmates, and prison resources; and (4) the absence of ready alternatives to the regulation. *Id.* at 89–90, 107 S.Ct. at 2261–62.

**4.** Our recent decision in *Romberg v. Nichols*, 953 F.2d 1152 (9th Cir.1992) is consistent with our holding in this case and with Ninth Circuit precedent. Like the Rombergs, the class of inmates is a prevailing party within the meaning of § 1988 because it succeeded on a significant issue. The form of that victory is not dispositive.

In *Romberg*, the jury found that the defendant police officers were liable for violating the Rombergs' Fourth Amendment rights. The jury awarded only nominal damages of one dollar. *Romberg*, at 1155. The district court then granted the Rombergs' motion for attorney's fees under § 1988, and the government appealed that decision. *Id.* at 1155.

We held that the Rombergs were prevailing parties within the meaning of § 1988, and re-

jected the argument that their victory was too insignificant to justify an award of attorney's fees. *Id.* at 1158. Specifically, we held that the amount of damages awarded the Rombergs was not dispositive. *Id.* at 1158–59. Rather, the jury's finding that the police officers were liable for violating the Rombergs' Fourth Amendment rights was sufficient to establish prevailing party status under § 1988. *Romberg*, at 1157. ("the Rombergs prevailed on a significant issue, and they prevailed on the merits before a jury"); *see Texas State Teachers Assn. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989) ("[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties").

Our holding turned on the significance of the issue on which the Rombergs prevailed, and we rejected the argument that nominal damages reflected an insignificant victory. *Romberg* did not change established law that formal judicial relief is not necessary to support prevailing party status under § 1988. *See e.g., Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980) ("Nothing in ... § 1988 conditions the District Court's power to award [attorney] fees ... on a judicial determination that the plaintiff's rights have been violated.... [P]arties may be considered to have prevailed ... without formally obtaining relief.").

713 F.2d 1416, 1419 (9th Cir.1983)) (emphasis in original). We apply a two-part test to resolve this question. *Sablan*, 856 F.2d at 1325. First, we determine whether this lawsuit actually brought about benefits initially sought by the inmate class. *Id.* Second, we examine whether the inmates' claims had a legal basis. *Id.*

We agree with the district court that the necessary causal link was established between Friend's class action and changes in jail policy. The district court found that the inmates succeeded on the issue of access to religion in a pre-trial settlement.[5] In response to Friend's class action, jail officials agreed to hold separate Roman Catholic services and to diligently arrange and coordinate policies on prisoners' rights to practice religion.[6] The district court concluded correctly that the pre-litigation settlement materially altered the legal relationship of the parties. This is "[t]he touchstone of the prevailing party inquiry." *Texas State Teachers Assn. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989).

The district court also found that plaintiffs partially prevailed on their claim for inmate possession of religious articles. Before commencement of this action, the jail policy manual was silent on the rights of inmates to use religious articles. County jail officials revised the manual in response to the district court's conditional summary judgment order. The revised manual explicitly recognized an inmate's right to limited use of religious articles. The district court found, and we agree, that a causal relationship existed between the inmates' suit and the changes in jail policy.

We turn now to the second part of the test to analyze whether the inmates' claims had a legal basis. *Sablan*, 856 F.2d at 1327. Alameda County officials contend that the inmates' claims had no legal basis because the actions taken by the County were not constitutionally mandated.

We reject this contention. In this context, our evaluation of the merits of a litigant's claims is extremely narrow. *Andrew v. Bowen*, 837 F.2d 875, 877 (9th Cir.1988). Our inquiry is "strictly limited to determining whether the claims asserted are 'frivolous, unreasonable, or groundless.'" *Id.* at 878 (quoting *Ortiz de Arroyo v. Barcelo*, 765 F.2d 275, 282 (1st Cir.1985)).

Our review reveals no basis for concluding that the inmates' claims were frivolous. We agree with the district court that the inmates raised legitimate issues related to their free exercise rights. Indeed, the district court conditioned its grant of summary judgment in favor of the county officials upon revision of the prison manual precisely because the inmates' free exercise claims were colorable. The district court's finding that the inmates' claims had a legal basis was not erroneous.[7]

---

**5.** Although the dissenting opinion asserts otherwise, it is clear that distinctly Roman Catholic services were one of the benefits sought by the inmates in filing this suit. The inmates specifically complained of the lack of scheduled Roman Catholic religious services, as distinguished from the fundamentalist Protestant services that were available.

**6.** The dissenting opinion suggests that this suit was simply a dispute between a Catholic lay minister and the Bishop, or between a Catholic lay minister and a Protestant minister, and that jail officials played no role in the absence of Catholic services. The jail conceded, however, that only a Protestant group operated in the jail after December, 1987, and that the jail captain asked the Catholics to "defer" their request to be allowed a time to conduct a Catholic service, until some indeterminate date in the future when a new chaplain would be hired. The record also indicates that Catholic Charities sent

a letter to the jail captain requesting "a timeslot for a Catholic worship service" and that he responded, "I do not intend to alter the program until the Chaplain's position is filled." Thus it is undisputed that the only scheduled religious service in the jail was operated by a fundamentalist Protestant ministry, and that the Catholics' request to likewise have a scheduled service was indefinitely postponed by the jail.

**7.** Alameda County officials argue that the attorney's fees awarded here are excessive as a matter of law. The officials do not argue that the district court calculated the fee amount improperly. Instead, they merely contend that the inmates did not achieve their goals. This argument simply restates their objection to the district court's finding that the class of inmates is a prevailing party within the meaning of 42 U.S.C. § 1988. Because we uphold the district court's decision, we need not pursue this claim further.

## CONCLUSION

We conclude that the class of Roman Catholic inmates prevailed against the Alameda North County Jail within the meaning of 42 U.S.C. § 1988. The judgment of the district court is AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

In this case the district court has ordered the taxpayers of Alameda County to pay thousands of dollars in attorney's fees in a matter originating in a dispute between different religious groups. Because the defendants are not responsible for religious conflicts among private parties, I dissent.

## I. BACKGROUND

This is an appeal from an award of attorney fees and costs to plaintiff pursuant to 42 U.S.C. § 1988. The district court awarded fees and costs finding that "plaintiffs' suit provided the impetus for defendants to more diligently attempt to arrange for personnel and to coordinate the services necessary to bring [Alameda] North County Jail practices in line with plaintiffs' constitutional rights."

The district court thus found that plaintiffs were prevailing parties, despite the fact that it never found that the County at any time had deprived the plaintiffs of any constitutional rights. Parties may be considered prevailing parties when a violation of rights is found, *see Romberg v. Nichols*, 953 F.2d 1152, 1157 (9th Cir.1992), or when they vindicate rights through settlement without formal relief. *Sablan v. Dep't of Finance of N. Mariana Islands*, 856 F.2d 1317, 1324 (9th Cir.1988) (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam)). Here, no rights were violated so none could be vindicated.

The underlying case is a 42 U.S.C. § 1983 class action alleging the failure to provide inmates at the North County Jail in Alameda County the right to participate in religious services performed by a Roman Catholic priest and denying Roman Catholic inmates the right to possess rosary beads and scapulars in their cells.

Both parties filed motions for summary judgment. At the hearing on the cross-motions, the defendants agreed to set forth in writing the jail policies regarding religious services and access to religious articles. On September 20, 1989, the district court issued an order granting the County/defendants' motion for summary judgment and denying the plaintiffs' motion on the issue of possession of rosary beads and scapulars in their cells. The district court also directed defendants to submit to the court a written copy of the policy of the jail regarding the accommodation of the religious needs of inmates. Following submission of the written policy, the district court dismissed the action.

The plaintiffs appealed only the order of dismissal in regard to the rosary/scapular issue. A panel of this court consisting of Judges Goodwin, Browning and Rymer affirmed the district court in an unpublished opinion (*Friend v. Kolodzieczak*, 917 F.2d 27 (9th Cir.1990)). The panel held that the defendants had legitimate security reasons for banning rosaries and scapulars. The plaintiffs then filed their motion for attorneys fees and costs which was granted and this appeal followed.

The jail is a modern facility which houses over 700 inmates. The average length of stay is six days. The exception is about twenty-five inmates who have been at the jail for longer than two years. Religious services take place in two multi-purpose rooms on each of the jail's six housing floors.

Religious services are provided for all inmates at the jail through the jail chaplain as well as through religious volunteers. Although there is a Catholic church across the street from the jail, the Catholic Diocese of Oakland has never assigned a Roman Catholic priest to minister at the jail due to a shortage of priests.

In January of 1987, the Catholic Bishop of Oakland assigned a lay minister, James Rodgers, from Catholic Charities, as the detention minister ("Rodgers"). At the jail, interdenominational Christian services were offered on Sunday mornings, in which Catholic Charities' volunteers participated.

The Bishop had agreed to this arrangement as it was in keeping with the Catholic Dioceses' commitment to ecumenical cooperation. Rodgers used a Roman Catholic study guide and scriptural teachings as the basis for the services he conducted on Sunday morning. He also ministered to individuals as requested during visiting hours, and could bring the sacrament of communion to inmates at those times.

There were, however, tensions between the protestant group involved in the interdenominational program, Follow Up Ministries, and the Catholic Charities volunteers. The tensions escalated, and in the fall of 1987, lay minister Rodgers attempted to get his own Catholic-identified services. This was not due to any inability to minister to Catholics, however, but because he wanted to be able to proselytize to non-Catholics. Indeed, he admitted in his deposition that he did not even know who the Catholics in the jail were.

In December 1987 or January 1988, Rodgers stopped taking part in the interdenominational services altogether. Rodgers began to minister on an on-call basis only. He conditioned his return upon getting his own time slot for services, but the jail was not made aware of this demand or that he had quit. Neither the Catholic Church nor Catholic Charities ever appointed anyone else to take his place.

## II. APPLICABLE LAW

The majority holds that plaintiffs were the prevailing parties because the necessary causal relationship exists between the class action and changes in jail policy, and the pre-litigation settlement altered the legal relationship of the parties. Both conclusions are factually and legally wrong.

In *Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), the Supreme Court held that plaintiffs who succeed "on any significant issue in litigation which achieve[s] some of the benefit the parties sought in bringing the suit, [have] crossed the threshold to a fee award of some kind." *Id.* at 791–92, 109 S.Ct. at 1492–93 (internal quotations omit-

ted). However, at a minimum, there must be a "resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* at 792, 109 S.Ct. at 1493. A change in a legal relationship may be demonstrated through a judicial finding of a constitutional violation in cases where there is formal relief, *see, e.g., Romberg*, 953 F.2d at 1157, or in the case of informal relief, when it is determined that the lawsuit was the catalyst for constitutional reform on the part of the government. *Sablan*, 856 F.2d at 1325.

The Ninth Circuit has used a two part test to determine prevailing party status when there has been no formal relief. Proper application of this test assures that fees are not awarded if the government takes action but there are no constitutional deficiencies. We first "determine what [plaintiffs] sought to accomplish in bringing [this] lawsuit and then determine whether the lawsuit was causally linked to the relief actually obtained." *Sablan*, 856 F.2d at 1325. Here, plaintiffs did not prevail in any of the claims presented in their complaint. Thus, the lawsuit did not bring about any benefits sought by the inmate class, and plaintiffs fail the first prong of the *Sablan* test.

The second prong of the *Sablan* test is whether there is a legal basis for plaintiffs' claims. *Sablan*, 856 F.2d at 1325. "If it is judicially determined that defendants' conduct, however beneficial it may be to plaintiff's interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense." *Id.* at 1327 (citation omitted). The undisputed facts demonstrate without question that the County has never refused the plaintiffs the right and opportunity to practice their Roman Catholic religion and participate in Roman Catholic sacraments at the jail. In There was therefore no legal basis for the plaintiffs' claims, nor any change in the legal relationship between the parties. Thus, plaintiffs fail the second prong of the *Sablan* test.

## III. DISCUSSION

The plaintiffs' complaint alleged that defendants denied them the opportunity to possess rosaries and scapulars, to participate in the sacraments of reconciliation (confession) and communion, and to attend Roman Catholic mass. The plaintiffs further complained of the lack of visits from Catholic priests. All of these claims were groundless, and the plaintiffs did not prevail on any of them, nor did they obtain any other relief.

### A. *Possession of Religious Articles.*

This court previously held that the defendants' refusal to permit personal possession of rosary beads and scapulars in cells did not violate plaintiffs' constitutional rights. The merits of that claim need not be relitigated here.

The jail's written policy of permitting the use of all religious articles at religious services after inspection predates the lawsuit. In the year that the lay minister attended the Christian ecumenical services, he never had a problem with bringing into the jail all religious items required to conduct services.

Nevertheless, defendants clarified its written its policy on religious articles.[1] The policy was changed so that it specifically mentioned rosaries and scapulars as examples of articles permitted during religious services. The majority asserts, without explaining, that the revision was a material change in the legal relationship between the parties. However, the litigation concerned the possession of rosary beads and scapulars in cells, and the inmates lost. Nothing else was claimed or contested. The County continued to permit religious articles at religious services, as it had always done, and there is simply no evidence to the contrary.

To claim that clarifying a policy that always existed represents a material change in the legal relationship of the parties places form before substance. The plain fact is that the new writing did not change in any degree the legal relationship of the parties.

### B. *Availability of Communion, Confession and Mass.*

The jail was not responsible for the availability of the sacraments of communion, confession (reconciliation) or mass which can be celebrated only by a priest. The lay minister could bring communion (wafers consecrated by a priest) to the inmates upon request during visiting hours. While Rodgers knew that he and his volunteers could bring communion during the interdenominational services as well, they declined to do so.

Only priests may hear confessions. If an inmate requested the services of a priest, that request was conveyed to Catholic Charities by the jail chaplain or by other jail administrative personnel.

After lengthy discovery, the record shows only one instance in which an inmate's request for Catholic sacraments went unfulfilled. It involved Jack Friend's (the named plaintiff) request for confession. Catholic Charities arranged for a priest to hear his confession. A private room, which is used for attorney-inmate conferences, but without a door, was available but the priest was not comfortable hearing confession in that room, and left. The jail, at Friend's request, made numerous attempts to contact the priest for another confession in an appropriate setting, but the priest never responded. The lay minister Rodgers admitted that "We've fallen down on that particular task [arranging confession for Friend] and it slipped

---

**1.** The earlier policy stated, in relevant part: "All materials brought to the jail for detainee's religious edification will be delivered to ... and distributed by the I.S.O. [Inmate Services Officer].... No other items may be brought into the service and none may be taken from the service without prior approval and physical inspection by I.S.O."

The revised policy states in relevant part: "[r]eligious items, allowed only during the religious services, are limited to those which present only a moderate security threat. Examples include a rosary or a scapular."

through the cracks, and I'm not particularly proud of that."

Jack Friend was in jail awaiting trial for murder with special circumstances, and was considered a security risk. It is clearly unreasonable to assert that the County as the result of that single instance deprived an inmate of his constitutional religious rights. The room was one in which attorneys talked to their clients in confidence, and was satisfactory for Sixth Amendment purposes. The County cannot be faulted for not having the foresight to know that the room was not satisfactory for one Catholic priest. It certainly cannot be held responsible for the neglect of Catholic Charities in not scheduling the priest for another time.

As to the sacrament of mass, Rodgers acknowledged that the celebration of a Roman Catholic mass was neither necessary nor practical given the circumstances and logistics of a jail and the shortage of Catholic priests. The lack of priests is, of course, something outside the power of the County to correct.

In summary, the County did not violate the plaintiffs' rights vis-a-vis the Roman Catholic sacraments of confession, communion or mass, nor was any relief obtained which vindicated their religious rights in this regard. The County only set forth certain jail policies in writing which had always existed. There is absolutely no basis for prevailing party status on these issues. That leaves the issue of providing for separate Roman Catholic services by Catholic lay ministers.

C. *Separate Catholic–Identified Services.*

In their complaint, the inmates alleged a lack of Catholic religious services, in contrast to the services conducted by the group Follow Up Ministries, described as a fundamentalist Protestant group. The majority, pointing to this allegation, claims that through the suit the inmates won the right to conduct Catholic services.

The Catholic Charities lay minister, with the approval of the Bishop, joined in with the Follow Up Ministries volunteers to perform interdemonational services for much of 1987. During these services, he identified himself as a Catholic and used Catholic readings and scriptures as the basis for the service. Thus, contrary to the assertions of the majority, the Follow Up Ministry program permitted truly interdenominational services.

In the fall of 1987, the Catholic lay minister became dissatisfied with the interdenominational service which was approved and accepted by the Catholic Bishop and wanted to conduct a program separate from those services. His motive was to permit him to proselytize to non-religious or non-Catholic inmates and had absolutely nothing to do with the religious rights of Catholic inmates. After December 1987, the Catholic lay minister refused to take part in Sunday services. This refusal explains why there were only services run by Follow Up Ministries after that date. It was not, as the majority implies, the fault of the jail; it was due to the preferences of the Catholic lay minister.

When the jail commander received Catholic Charities' written request for separate Catholic services in January 1988, he responded that he would not make any changes in the jail's religious program until the then vacant chaplain position was filled. That certainly should be understandable. The Bishop had informed the jail commander that the Catholic Charities lay minister would be participating an interdenominational service, citing the Church's commitment to ecumenical cooperation. But the lay minister became dissatisfied with this approach, and told the jail commander he wanted separate Catholic-identified services. When faced with a difference in opinion between the lay minister and his Bishop, the jail commander proceeded carefully and with caution, waiting for the new chaplain to arrive before making any change. It makes sense that the jail commander would not want to make this change without advice from the jail chaplain who was directly responsible for the religious program at the jail. To contend that the jail interfered with the religious rights of the

jail inmates by waiting simply cannot stand.

The request for a space for separate Catholic services was not "indefinitely postponed," as the majority claims. Rather, it was implemented four or five months after the new chaplain started. The failure to move more rapidly, however, does not implicate any of plaintiffs' constitutional rights. The impetus for the separate service was the Catholic lay minister's own idea of what should be provided, contrary to the program of his own Bishop. The previous lack of separate, Catholic identified services was not a constitutional violation. Thus, the *Sablan* test cannot be satisfied, because the lawsuit was not the "catalyst for constitutional reform." *Sablan, supra,* 856 F.2d at 1325. The institution of separate Catholic-identified services at the jail therefore does not entitle the plaintiffs to prevailing party status.

The Christian ecumenical service did not deprive the Catholic inmates of any religious constitutional right. That being the case, it cannot be asserted that slowness in instituting Catholic services was a constitutional violation. Section 1988 simply does not authorize the award of attorney fees because the jail did not make a change which was not constitutionally required as fast as the district court thought it should.

Before dismissing the case, the district court required a revised jail policy addressing accommodation to plaintiffs' religious needs, including the scheduling of religious services. However this writing also fails to transform plaintiffs into prevailing parties. The evidence is definite that the written policy was the same policy that the jail always carried out. There was no evidence that the jail had a practice or condition that violated the constitution. There was never a policy that interdenominational services were sufficient for all religious groups. The County had consistently provided separate facilities to the Black Muslims. The regular time and location for Catholic-identified services agreed to by the jail chaplain and administration was at the request of Catholic Charities. The Catholic-identified service does not address the deficiency, alleged in the complaint, of Catholic priests to perform sacraments and minister to inmates.

The lay minister, who was authorized to minister to the Catholics, stopped taking part in Sunday services for his own reasons. The jail had nothing to do with the pique of the lay minister and the resulting absence of Catholic representatives at the Sunday services from January through October of 1988.

In order to bring back a Catholic presence on Sunday mornings (it remains unclear whether the inmates had a position or preference in the dispute between the Catholic lay minister and his protestant contemporaries), the new jail chaplain and the jail administration established a place for separate Catholic-identified services in October 1988. The district court considered this a vindication of plaintiffs' free exercise rights. As explained, this leap in logic is not supported by the facts or law. Catholic Charities, which performs the services, remains a lay ministry group that cannot address the lack of Catholic priests which was the basis of the litigation.

The district court also put much stock in the chronology of events, regarding the lawsuit as the "impetus" to bring the jail "in line with plaintiffs' constitutional rights." However, the County never violated the plaintiffs' constitutional rights; the actions taken by the County never expanded those rights in any way nor gave the plaintiffs anymore of what they asked for in the complaint. The Catholic lay minister was the impetus for the Catholic-identified services, which can scarcely implicate a constitutional right if even the Bishop did not require them! The plaintiffs simply got no relief, and there was no "constitutional reform," *Sablan, supra,* 856 F.2d at 1325, so the lawsuit could not have been the impetus for anything.

## IV.  CONCLUSION

This litigation arose because of plaintiffs' dissatisfaction with the inability to possess certain religious items and problems with access to confession, communion and mass. As explained, the former was justified be-

cause of security concerns and the latter was not the fault of the jail. The litigation continued with the original demand transformed to one for separate Catholic-identified services. This demand came from the Catholic lay minister who was dedicated to proselytizing non-Catholics and who disagreed with his Bishop's approval of interdenominational services. It was further fueled by the fact that the Catholic lay minister had a dispute with his protestant associates over that proselytizing and left the jail. A Catholic lay minister doesn't agree with his Bishop and gets into a dispute with his protestant associates, and the tax payers of Alameda County become subject to $100,000 attorney fees! It really is difficult to understand why that is not "frivolous, unreasonable or groundless."

The uncontested facts show that there was never any deprivation of religious constitutional rights by the defendants. The sole cause of there being any less opportunity to participate in religious services than they might have enjoyed otherwise was the fact of incarceration and the lack of resources of the Catholic Church and Catholic Charities.