OPINION OF THE COURT
AMBRO, Circuit Judge,
with whom SCIRICA, RENDELL, BARRY, FUENTES, SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR., and VANASKIE, Circuit Judges, join.
Does a party “prevail” within the meaning of 42 U.S.C. § 1988 if it obtains a temporary restraining order the day after it files suit (after a hearing but before briefing from the opposing side), but 22 days later is denied a preliminary injunction because the opposing party’s voluntary change of position moots the case? Because we believe that Supreme Court precedent requires us to answer no, we affirm the same determination by the District Court.[1]
I. Factual Background and Procedural History
Live Gold Operations, Inc. manages and promotes the music recording and per *225 forming groups known as “The Platters” and “The Cornell Gunter Coasters” pursuant to licenses of unregistered trademarks. In August 2007, the State of New Jersey learned that Live Gold had scheduled a two-week concert, to begin on August 18, of the Platters and Coasters groups at the Hilton Hotel in Atlantic City. The State informed Live Gold that its use of the trademarks “The Platters” and “The Cornell Gunter Coasters” might violate the New Jersey Truth in Music Act, which provides in pertinent part:
A person shall not advertise or conduct a live musical performance or production through the use of an affiliation, connection or association between the performing group and the recording group unless:
(a) The performing group is the authorized registrant and owner of a federal service mark for the group registered in the United States Patent and Trademark Office; or
(b) At least one member of the performing group was a member of the recording group and has a legal right by virtue of use or operation under the group name without having abandoned the name or affiliation of the group; or
(c) The live musical performance or production is identified in all advertising and promotion as a salute or tribute; or
(d) The advertising does not relate to a live musical performance or production taking place in this State; or
(e) The performance or production is expressly authorized by the recording group.
N.J. Stat. Ann. § 2A32B-2.
Live Gold responded by providing the State with evidence of its ownership of common law unregistered trademarks in each group’s name and asserting that the unregistered trademarks should be considered “express authorizations” under subsection (e). Not satisfied that ownership of an unregistered trademark could comply with the Truth in Music Act, the State advised the Hilton Hotel that it could avoid liability under the Act by ticketing and advertising the concert as a “tribute” or “salute” to the Platters and Coasters groups. Hilton complied.
On August 17, 2007, the day before the first Hilton concert, Live Gold sued the State, seeking a TRO and injunctive relief against its enforcement of the Truth in Music Act in the manner it advised. Live Gold argued, among other things, that the State’s enforcement of the Act conflicted with the federal Lanham Act, 15 U.S.C. § 1125, and violated its civil rights.
At the TRO hearing before Judge Debevoise, Live Gold asserted that it had the right to conduct performances using its unregistered trademarks, and objected to the State’s actions that caused the Hilton to label the groups’ performances inaccurately as “tributes” or “salutes.” The State responded that, because Live Gold’s unregistered trademarks were not “express authorizations” under the Act, the Hilton concert must be billed as a tribute or salute. Judge Debevoise expressed doubts about the State’s position:
That is not what [Live Gold’s groups] want to do. That is not what they say accurately describes them. So, in effect, the State is telling the Hilton to advertise or publicize this event in a way which is not in accordance with the description which these promoters of the events say is accurate.
*226 I think there is sufficient problem with the State’s position so that I — there is a likelihood of success on the merits in this particular case.
[T]here may be substantial federal rights being impaired by the action of the State in this case, generally, under the statute ... important federal rights are at issue, both freedom of speech rights under the Lanham Act and private rights to nonregistered trademark-trade name. Consequently, the Temporary Restraining Order will issue.
[W]e’ll have an opportunity to get to the merits of this case on September 7th.
(Emphasis added.) The TRO “temporarily restrained and enjoined [the State] from interfering in any way with [the Hilton concert], and the marketing and promotion thereof.”
On September 7, 2007, the parties returned to the District Court for a hearing on the preliminary injunction. In its written submission prior to the hearing, the State argued that an unregistered trademark satisfied the Truth in Music Act only if the performing group obtained express authorization from an original group member, included an original member, or denominated itself as a tribute or salute to the original group. The State contended that its interpretation of the Act was consistent with the Lanham Act, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. It also objected to Live Gold’s suit on jurisdictional grounds.
Judge Debevoise began the preliminary injunction hearing by asking the State why it insisted on distinguishing between registered and unregistered trademarks: “Why shouldn’t they proceed on an equal basis, two valid trademarks?” In response, the State contended that because the Lanham Act accorded a rebuttable presumption of validity to registered trademarks, its action here against unregistered trademarks was consistent with federal law. Judge Debevoise repeatedly rejected this argument, explaining that the differences under federal law between registered and unregistered trademarks for purposes of validity did not authorize the State to discriminate against an unregistered trademark, once proven valid. “There’s no reason for it,” he declared. Nevertheless, the State continued to press its interpretation of the Truth in Music Act. Judge Debevoise again rejected the State’s position, stating, “Well, I fail to see it.”
After rejecting the State’s arguments, Judge Debevoise suggested that the State reconcile the Truth in Music Act with the Lanham Act by interpreting subsection (e) of the former to permit unregistered trademark holders to perform under their group names without any additional requirements. The State suddenly capitulated, effectively adopting Live Gold’s interpretation of the Act. Incredulous, Live Gold objected that the State had made “a 180 degree shift in position.” Judge Debevoise agreed, telling the State that the position in its brief was “contrary to what I [just] understood you to say.” In response, the State explained that its previous position “was inadvertently put into the brief.” The Judge then declared that the State would be “bound” by its new interpretation of the Act.
Live Gold then moved for summary disposition, contending that it “should win” because the State had “admittfed] the allegations” in the complaint. Judge Debevoise observed that the State’s new position resolved the “basic legal problem, which was an equal protection problem, a First Amendment problem, [and] a due *227 process problem.” He again took note of the State’s “evolved” position, but saw no need to “go any further.” He then announced:
We have a statement by the State of New Jersey as to what the meaning of this statute is insofar as it relates to common law trademarks, and I think we’ve stated it. If there’s a valid common law trademark under the Lanham Act, and if whoever has possession of it can establish a right to that possession, he is to be treated — or she is to be treated in the same way as the holder of a registered trademark. Now, no necessity of — to say or give any tribute to anybody. So we have an agreement on that.
The Court then vacated the TRO, which had already expired “by its own term[s] [after] 10 days, and ... was directed primarily to the August performance at the Hilton.” Having secured the State’s position going forward, Judge Debevoise left open the option of continuing consideration of the preliminary injunction, but he found no need to convert the TRO to a preliminary injunction at that time.
Subsequently, Pryor Cashman LLP sought leave to move for an award of its attorney’s fees and costs incurred in representing Live Gold. The issue was referred to Magistrate Judge Salas, who denied Pryor Cashman’s application, concluding that Live Gold was not a “prevailing party” under 42 U.S.C. § 1988(b) because the State had voluntarily changed its position on the meaning of the Truth in Music Act.
Live Gold sought review of Judge Salas’s order by the District Court. The State filed a motion to dismiss. Judge Debevoise addressed both issues in a hearing on March 16, 2009. At that hearing, he first addressed the State’s motion to dismiss. Seeking to identify any unresolved constitutional issues, he asked the State to confirm that “[e]ven though literally ... [the Truth in Music Act] might be interpreted to exclude [performing groups holding unregistered trademarks], it doesn’t really do so and you’re not interpreting it to do so.” The State concurred, stating that “[t]he [revised] position we took on September 7, 2007, in this courtroom, is the position we’re taking now.” Judge Debevoise then obtained the agreement of all parties that the preliminary injunction hearing resolved Live Gold’s constitutional claims, and asked, “Why shouldn’t [Live Gold’s complaint] be dismissed, other than [Pryor Cashman’s] application for attorney’s fees?” After hearing Live Gold’s arguments, he remained unpersuaded, explaining “I just don’t know what else there is to address.... In effect, [Live Gold] won the case.”
Judge Debevoise then turned to Pryor Cashman’s application for attorney’s fees. After hearing from Live Gold, he asked, “State, why shouldn’t you be responsible for attorney’s fees[?]” In response, the State replied that a fee award was inappropriate because “there was no past enforcement action” and because it had never taken any position on the Truth in Music Act. Judge Debevoise disagreed with the latter contention, reminding the State that it made a “180 degree change in position because [it] came in negating everything that [Live Gold] [was] urging, and in effect conceded [Live Gold] [was] right, and permitted everything to go forward.” The State again distanced itself from its initial arguments, explaining that they were “not ... as clear as they could have been” because the State was rushed in responding to the TRO application. The Court took the matter under advisement.
One month later, Judge Debevoise entered an order affirming the Magistrate Judge’s order denying reimbursement of Live Gold’s attorney’s fees and granting *228 the State’s motion to dismiss. In his order, Judge Debevoise held that Live Gold was not a prevailing party because he “did not enter a preliminary injunction or any other order on the merits of the case.” He also concluded that the State voluntarily changed its position, stating that “[w]hile it may be true that this court’s involvement aided in the resolution of the constitutional issues between the parties, the fact remains that the issues were not resolved as the result of a court order.” In granting the State’s motion to dismiss, Judge Debevoise concluded that Live Gold’s claims were moot in light of the parties’ agreement that the preliminary injunction hearing had resolved all of Live Gold’s constitutional claims. In this appeal, Live Gold challenges only the denial of attorney’s fees.
II. Governing Precedent
To be eligible to make a prevailing-party claim under § 1988, the plaintiff must, “at a minimum, ... be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant.” Tex. State Teachers Ass’n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). The change must be “judicially sanctioned,” Buckhannon Bd. & Care Home v. W. Va. Dep’t of Health & Human Res., 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), and must “achieve! ] some of the benefit the part[y] sought in bringing suit,” Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal quotation marks and citation omitted). A “voluntary change in conduct ... lacks the necessary judicial imprimatur on the change.” Buckhannon, 532 U.S. 598-99, 121 S.Ct. 1835. In other words, “a plaintiff does not become a ‘prevailing party’ solely because his lawsuit causes a voluntary change in the defendant’s conduct.” People Against Police Violence v. City of Pittsburgh, 520 F.3d 226, 232 (3d Cir.2008) (“PPAV”). Rather, the change in the parties’ legal relationship must be the product of judicial action. See Buckhannon, 532 U.S. at 605-06, 121 S.Ct. 1835.
The Supreme Court so far has identified two resolutions that establish prevailing party eligibility: (1) judgments on the merits, and (2) court-ordered consent decrees (including settlement agreements enforced through consent decrees). Id. at 604, 121 S.Ct. 1835. The first resolution contains two independent requirements: (1) a judgment (2) that was on the merits.[2]
A. The judgment requirement
A grant of summary judgment or a trial verdict in favor of the plaintiff is no doubt a “judgment.” In contrast, a court’s “judicial pronouncement that the defendant has violated the Constitution” does not create the requisite “material alteration of the legal relationship between the parties ... until the plaintiff becomes entitled to enforce a judgment.” Farrar v. Hobby, 506 U.S. 103,112-13,113 S.Ct. 566, 121 L.Ed.2d 494 (1992).
Thus, when an appellate court, in reversing the district court’s dismissal of the plaintiffs claim, ruled that the plaintiffs constitutional rights were violated, the Supreme Court held that the plaintiff had not “prevailed” because there was no enforceable judgment. Hewitt v. Helms, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987). The only “relief’ to the plaintiff from this appellate victory was “the moral satisfaction of knowing that a federal court *229 concluded that his rights had been violated.” Id. at 762,107 S.Ct. 2672.
B. The merits requirement
Any judgment must also be “on the merits.” As recognized by the Supreme Court shortly after § 1988 was amended to allow attorney’s fees, “Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims.” Hanrakan v. Hampton, 446 U.S. 754, 758, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam) (emphases added); see also id. at 757, 100 S.Ct. 1987 (“[I]t seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal”). Similarly, the Supreme Court has observed that “[rjespect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail.” Hewitt, 482 U.S. at 760,107 S.Ct. 2672.
Indeed, in an area of the law that “has been framed in various ways,” Hensley, 461 U.S. at 433,103 S.Ct. 1933, the merits-based requirement established in Hanrahan and Hewitt has been consistently repeated throughout the Court’s “prevailing party” jurisprudence. See Sole v. Wyner, 551 U.S. 74, 82, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007); Buckhannon, 532 U.S. at 603-04, 608, 121 S.Ct. 1835; Farrar, 506 U.S. at 110-12, 113 S.Ct. 566; Garland, 489 U.S. at 790, 792, 109 S.Ct. 1486. We have followed suit to hold that, to be entitled to prevailing party fees based on interim relief, relief must be “derived from some determination on the merits.” J.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267, 274 (3d Cir.2002).
III. Live Gold did not receive a “judgment on the merits,” and therefore was not a prevailing party.
A. The temporary restraining order was not issued on the merits.
In this case, we have a temporary restraining order. In PAPV, we held that injunctive relief “can, under appropriate circumstances, render a party ‘prevailing.’ ” 520 F.3d at 233.
However, the “merits” requirement is difficult to meet in the context of TROs and preliminary injunctions, as the plaintiff in those instances needs only to show a likelihood of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief. A “likelihood” does not mean more likely than not. Cf. Hackett v. Price, 381 F.3d 281, 290-91 (3d Cir.2004). Because of this, we have held that a court’s finding of “reasonable probability of success on the merits” is not a resolution of “any merit-based issue.” John T. v. Del. County, 318 F.3d 545, 559 (3d Cir.2003) (internal quotation marks and citation omitted). As this “probability” ruling is usually the only merits-related legal determination made when courts grant TROs and preliminary injunctions, it follows that parties will not often “prevail” based solely on those events.
Our decision in PAPV provides an example of that rare situation where a merits-based determination is made at the injunction stage. There, a rally organizer challenged the constitutionality of an ordinance that required groups to prepay police protection costs before they could receive a permit for parades and rallies. PAPV, 520 F.3d at 229. At the first hearing in the case, the District Court granted the requested TRO after “concluding that [the ordinance], ‘was facially unconstitutional,’ ” and that, even if the City voluntarily did *230 not enforce the ordinance (as it had offered to do), “a permit regime devoid of any prescribed process would also be unconstitutional.” Id. Therefore, the Court enjoined the City from enforcing the law, imposed its own temporary procedures governing permits, and directed the parties to meet and confer concerning a new proposal. Id. at 229-30. The City later proposed a revised ordinance, but the Court found it lacking, converted the TRO to a preliminary injunction, and requested further briefing. Id. at 230.
The City submitted a second revised ordinance, and in the meantime formally repealed the unconstitutional provision. Id. After this repeal, the City moved to dismiss the suit. Id. The Court denied the motion because no new procedures had taken the now-repealed ordinance’s place, and a lack of guidelines was itself unconstitutional. Id. The injunction remained in effect for over two years until a new ordinance was enacted that satisfied the concerns of the Court. Id. Only then did it lift the injunction and close the case with the parties’ agreement. Id.
The legal victories in PAPV are far from the events now before us. Judge Debevoise here never ruled, as did the PAPV Court, that the challenged law (or application of the law) was unconstitutional. Id. at 234. Instead, the TRO was based only on a “likelihood of success on the merits.”[3] App. 187. In PAPV, the TRO prohibited enforcement of the challenged ordinance and affirmatively created new procedures to govern the City. The TRO in our case merely enjoined the State of New Jersey “from interfering in any way with live performances by [Live Gold’s] ... groups at the Hilton Hotel in Atlantic City, New Jersey, and the marketing and promotion thereof.” The State remained free to enforce the Truth in Music Act (so long as it did not interfere with the Hilton performances).[4]
Therefore, the TRO here was not merits-based.[5] As such, it does not confer eligibility for prevailing party status. We thus turn to whether anything occurred after the TRO to resolve the controversy on the merits and render Live Gold the prevailing party under § 1988.
*231 B. The State’s actions after the TRO issued were voluntary, and no judgment was issued on the merits.
There was no determination on the merits in this case because the State mooted the case at the preliminary injunction hearing by agreeing with Live Gold’s position. As noted, the Supreme Court has identified two formal resolutions that make a winning attorney eligible for a fee award: (1) enforceable judgments on the merits, and (2) court-ordered consent decrees. Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835. Buckhannon characterized these two resolutions as “examples” of decisions that create the necessary material alteration of the legal relationship of the parties. Id. at 604-05, 121 S.Ct. 1835. There may be resolutions other than the two identified in Buckhannon that warrant prevailing party status (although the Supreme Court has yet to identify any). But even if they are merely examples, Buckhannon precludes the events in this case from qualifying as a third form of resolution that can support prevailing party status.
Some background helps to understand the sea change caused by Buckhannon in this area of the law. Prior to that decision, the rule in most circuits was that a plaintiff was a “prevailing party” if it “achieve[d] the desired result because the lawsuit brought about a voluntary change in the defendant’s conduct.” Id. at 601-02, 121 S.Ct. 1835. This became known as the “catalyst theory.” Id.
For example, we held pr e-Buckhannon that a plaintiff who could “prove that the existence of the lawsuit accomplished the original objectives of the lawsuit without a formal judgment c[ould] be a ‘prevailing party.’ ” Baumgartner v. Harrisburg Hous. Auth., 21 F.3d 541, 544 (3d Cir. 1994), overruled by Buckhannon, 532 U.S. at 602-05, 121 S.Ct. 1835. We applied the “well-established” catalyst theory to allow attorney’s fees when defendants “voluntarily changed their behavior to eliminate the complained-of conduct.” Id. To support this theory, we relied in part on the policy consideration that “if defendants could deprive plaintiffs of attorney’s fees by unilaterally mooting the underlying case by conceding to plaintiffs’ demands, attorneys might be more hesitant about bringing these civil rights suits, a result inconsistent with Congress’ intent in enacting section 1988.” Id. at 548. Thus, we held that plaintiffs could be prevailing parties “notwithstanding the absence of a judgment or consent decree” so long as they “accomplished the original objectives of the lawsuit.” Id. at 544, 551.
Were this the law governing us today, we would hold the prevailing party requirement satisfied, as Live Gold accomplished its objectives by filing a lawsuit that “catalyzed” the State to change its position voluntarily. In Baumgartner it did not matter that there was no judgment or consent decree; because the “existence of the lawsuit accomplished the original objectives of the lawsuit,” attorney’s fees would be warranted. Id. at 544.
But Buckhannon overruled Baumgartner, and the latter is no longer the law. In Buckhannon, the Supreme Court reiterated that theretofore it had “only awarded attorney’s fees” when the plaintiff obtained a “judgment on the merits” or a “court-ordered consent decree.” 532 U.S. at 605, 121 S.Ct. 1835. It had not awarded attorney’s fees under the following circumstances: where the plaintiff acquired a “judicial pronouncement that the defendant has violated the Constitution unaccompanied by ‘judicial relief,’ ” id. at 606, 121 S.Ct. 1835 (quoting Heioitt, 482 U.S. at 760, 107 S.Ct. 2672) (emphasis in original); where the plaintiff “secured the reversal of a directed verdict,” id. at 605-06, 121 S.Ct. *232 1835 (citing Hanrahan, 446 U.S. at 759, 100 S.Ct. 1987); or where there was a “nonjudicial alteration of actual circumstances,” id. at 606, 121 S.Ct. 1835 (citation omitted) (internal quotations marks omitted). The “catalyst theory” was added to this list, as there is no “judicially sanctioned change” in the parties’ “legal relationship.” Id. at 605, 121 S.Ct. 1835. “A defendant’s voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change.” Id. Thus, the Supreme Court concluded, “the ‘catalyst theory’ is not a permissible basis for the award of attorney’s fees.... ” Id. at 610, 121 S.Ct. 1835.
In so holding, it considered the same policy argument we raised in Baumgartner — that without the catalyst theory “defendants [could] unilaterally moot[ ] an action before judgment in an effort to avoid an award of attorney’s fees” — but was not swayed. Buckhannon, 532 U.S. at 608-09, 121 S.Ct. 1835. Thus, however persuasive that argument may seem, it cannot influence our decision here.[6]
❖ * * * * *
The TRO Live Gold obtained was plainly not a “judgment on the merits.” Judge Debevoise, who entered the TRO, certainly did not think so. At the preliminary injunction hearing the State chose to agree with the position pressed by the plaintiff. As that agreement resolved the constitutional issues, the case was mooted. Even if there are circumstances where a “judgment on the merits” or a “court-ordered consent decree” is not required for prevailing-party status, Buckhannon prevents the events in this case from qualifying.
Because no enforceable judgment on the merits issued in this case and the State’s actions that mooted the case were voluntary, Buckhannon tells us that Live Gold was not a prevailing party. Given that precedent, we affirm.
ROTH, Circuit Judge, dissenting, with whom McKEE, Chief Judge, SLOVITER and ALDISERT, Circuit Judges, join.
“When does a party ‘prevail’ within the meaning of 42 U.S.C. § 1988?” That is the basic question that both parties here are asking. The Majority qualifies the question by referring to certain facts of record: “Does a party ‘prevail’ if it obtains a temporary restraining order the day after it files suit ... but 22 days later is denied a preliminary injunction because the opposing party’s voluntary change of position moots the case?” The Majority answers “No” to the question.
I would add different facts to the basic question — and, by doing so, I arrive at a different answer. My “different” qualifying facts are clearly found in the record of this case. Moreover, my facts support a finding of “prevailing party.”
I acknowledge that the qualifying facts that the Majority depends upon are reflected in the record before us. As the Majority states, there was a temporary restraining order (TRO) granted. The Majority does not mention, however, that the TRO granted a large part of the relief plaintiffs sought.
Again, as the Majority states, there was no preliminary injunction (PI) granted when the parties returned for the September 7 hearing. But, insofar as Live Gold was asking to enjoin the State’s interference with the August concert, the issue *233 was moot. The concert had been performed as Live Gold requested, that relief had been granted, and there was no further need to consider it. The issue remaining was whether the State would attempt to force other concerts by the holder of a valid common law trademark to be designated as “tributes” or “salutes.” The State agreed that it would not apply the Act in such a way. Moreover, the PI, which would have addressed this issue, was not dismissed out of hand. The court left open the option of continuing consideration of the PI at a later time if necessary, explaining “[s]o I’m not setting a date, I’m vacating the temporary restraining order, and if there’s any serious problems that arise which the plaintiffs think require emergent relief, they can ask for it to be rescheduled on short notice.” (App.389.) That the court felt that such relief would not be necessary is evident from the fact that the court had declared that the State would be “bound by” the State’s new interpretation of the Act. (App.387.) The court saw no need to “go any further.” (App. 388.)
The court took note of the State’s “evolved” position and then stated:
We have a statement by the State of New Jersey as to what the meaning of this statute is insofar as it relates to common law trademarks, and I think we’ve stated it. If there’s a valid common law trademark under the Lanham Act, and if whoever has possession of it can establish a right to that possession, he is to be treated — or she is to be treated in the same way as the holder of a registered trademark. Now, no necessity of — to say or give any tribute to anybody. So we have an agreement on that.
(App.388.) There was no dissent.
This conclusion by the court, that a valid common law trademark was to be recognized in the same way as a registered trademark, was the merits question put to the court by Live Gold — and the State of New Jersey was now bound in this action by this legal conclusion. I cannot imagine that the State would dare come again before the District Court and take any position contrary to the ruling of the court: “So we have an agreement on that.” Nor, as I discuss later, would the State be in the position to contend in any future action before the New Jersey District Court that a valid common law trademark was not to be accorded the same recognition as a registered one. If it did so, the State would be barred by judicial estoppel.
With these facts in mind, I state my question as follows: “Does a party ‘prevail’ under the meaning of 42 U.S.C. § 1988 when it has obtained a TRO, granting an important part of the relief sought, and further when its opponent has been bound by the District Court to the position of law that grants complete relief on the merits of the complaint.” I answer ‘Tes.” I conclude from this factual setting, supported by the record, that Live Gold is clearly a prevailing party and, thus, deserves an award of its reasonable attorney’s fees.
Moreover, this conclusion is within the boundaries of “prevailing party” as the Supreme Court has set them out. First, I agree with the Majority that the Court points to two types of outcomes — judgments on the merits and consent decrees— that confer prevailing party status, and it cites one outcome — a voluntary change in conduct as a result of litigation — that does not. Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep’t of Health & Human Res., 532 U.S. 598, 603-05, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Nevertheless, as the Majority concedes, the Court has left the door open to other, yet to be defined, results that may confer prevailing party status. See ante, 230-31.
*234 The Court has articulated two factors relevant to the prevailing party inquiry: (1) whether there is a “judicially sanctioned change in the legal relationship of the parties,” id. at 603,121 S.Ct. 1835, that “achieves some of the benefit the part[y] sought in bringing suit,” Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal quotation marks and citation omitted), and (2) whether the party “receive[s] at least some relief on the merits of his claims,” Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835 (“ ‘It seems clearly to have been the intent of Congress to permit ... an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal.’ ” (quoting Hanrahan v. Hampton, 446 U.S. 754, 757, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980))).
The Majority contends, however, that Live Gold did not receive a judgment on the merits. The Majority does agree that the TRO Live Gold obtained constituted a judgment and that injunctive relief “can, under appropriate circumstances, render a party ‘prevailing.’ ” See ante, 229 (quoting People Against Police Violence v. City of Pittsburgh (PAPU), 520 F.3d 226, 233 (3d Cir.2008)). But, I part ways with the Majority on its conclusion that the TRO here was not a resolution on the merits.
I find it clear that the TRO obtained by Live Gold was a “judicially sanctioned change in the legal relationship” between Live Gold and the State of New Jersey. The TRO allowed Live Gold to achieve much of the benefit it sought in bringing suit and provided some relief on the merits of its claims. Before the TRO hearing, New Jersey indicated that Live Gold could be penalized if the Platters and the Coasters were not billed as “tribute” bands. After the District Court issued the TRO, the bands were permitted to perform under the names “Platters” and “Coasters” without modifiers like “tribute” or “salute to,” and the State was prohibited from penalizing Live Gold for doing so.
Perhaps, the Majority balks at the straightforward conclusion that there was relief here on the merits because it fears that “consent decrees” and “judgments on the merits,” or their equivalents, are the only types of outcomes that confer prevailing party status. However, as the Majority seems to concede, there is little doubt that a plaintiff who gains preliminary relief may be a prevailing party. The Supreme Court has not disturbed the longstanding rule that “ ‘plaintiffs may be considered “prevailing parties” for attorneys’ fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit,’ ” Farrar v. Hobby, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (quoting Hensley, 461 U.S. at 433, 103 S.Ct. 1933), as long as the relief obtained provides at least some relief on the merits, see Buckhannon, 532 U.S. at 604,121 S.Ct. 1835, and consists of a judicially sanctioned change in the legal relationship of the parties, see Rhodes v. Stewart, 488 U.S. 1, 4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (per curiam) (plaintiff not prevailing party where declaratory judgment was entered after his death and thus could not change his legal relationship to defendants).[1]
Moreover, the precedent of this Circuit — and that of every other circuit but one — is clear that interim injunctive relief can, in appropriate cases, constitute a *235 “court-ordered change in the legal relationship between the plaintiff and the defendant” to confer prevailing party status. See PAPV, 520 F.3d at 232-33 (concluding that “relief on the merits achieved in the form of a preliminary injunction.can confer ‘prevailing party’ status”) (internal quotations omitted).[2] The Majority’s analysis casts doubt upon this well-supported legal proposition. I hope, however, that this Court will continue to recognize that interim relief remains a proper basis for an award of attorney’s fees when that relief is based on a determination of the merits of a plaintiffs claim.
Furthermore, the Majority’s conclusion that the TRO in this case was not granted “on the merits” suffers from the failure of the Majority to offer a definition or test for when a decision is “on the merits” in a case involving the grant of preliminary relief. Rather, the Majority states merely that “the ‘merits’ requirement is difficult to meet in the context of TROs and preliminary injunctions,” and that the “decision in PAPV provides an example of that rare situation where a merits-based determination is made at the injunction stage.” Ante, 229. This conclusion is confusing in light of the Majority’s acknowledgment that to obtain a TRO or preliminary injunction, the plaintiff needs to “show a likelihood of success on the merits.” Id.; see also Munafv. Geren, 553 U.S. 674, 690, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). One would expect that when a plaintiff makes a sufficient showing of likelihood of success on the merits to obtain “an ‘extraordinary and drastic remedy,’ ” a remedy that is “never awarded as of right,” Munaf, 553 U.S. at 689-90, 128 S.Ct. 2207, this victory would frequently result in prevailing party status.[3]
*236 Instead, the Majority argues that a preliminary injunction reflects a determination on the merits only in a case like PAPV, where the court granted a preliminary injunction lasting two years, and stated that the challenged statute was “facially unconstitutional.” While it was clear in PAPV that the District Court’s determination was “on the merits,” I disagree with the Majority’s suggestion that such elaboration of facts is required. This Court’s post-Buckhannon precedents have never applied such a standard. Rather, in J.O. v. Orange Twp., we stated simply that plaintiffs “who achieve favorable interim relief may be entitled to prevailing party attorney’s fees as long as the interim relief granted derived from some determination on the merits.” 287 F.3d 267, 274 (3d Cir.2002) (emphasis added). Contrary to the Majority’s reasoning, PAPV did not distinguish “reasonable probability” from “more likely than not,” nor did it consider whether the district court had found that the plaintiffs were more likely than not to prevail on their claims. It simply noted that, as was the case here, the grant of preliminary injunctive relief reflected a “finding of a likelihood of plaintiffs success on the merits.” Id. at 233.
I submit that the proper test to determine whether interim relief is on the merits is to distinguish (1) whether the relief is a “ ‘stay put’ order[ ] which merely servefs] to maintain the status quo pendente lite ” and which “do[es] not afford meaningful relief on the merits of the underlying claims,” PAPV, 520 F.3d at 226 (citing John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit, 318 F.3d 545, 558-59 (3d Cir.2003)), or (2) whether the relief “placed a judicial imprimatur on plaintiffs’ entitlement to substantially all the relief they sought in the complaint.” 520 F.3d at 233.[4]
Several circuits, in considering this issue, have adopted similar rules. See, e.g., Garcia v. Yonkers Sch. Disk, 561 F.3d 97, 106 (2d Cir.2009) (“a plaintiffs request for a temporary restraining order may be sufficient grounds to grant attorney’s fees to *237 the plaintiff pursuant to 42 U.S.C. § 1988(b)!,]” as long as the temporary restraining order addresses the merits of the case and does not “merely maintain! ] the status quo”); Dearmore v. City of Garland, 519 F.3d 517, 524 (5th Cir.2008) (“Under these facts, to qualify as a prevailing party under § 1988(b), we hold that the plaintiff (1) must win a preliminary injunction, (2) based upon an unambiguous indication of probable success on the merits of the plaintiffs claims as opposed to a mere balancing of the equities in favor of the plaintiff, (3) that causes the defendant to moot the action, which prevents the plaintiff from obtaining final relief on the merits.”); N. Cheyenne Tribe v. Jackson, 433 F.3d 1083, 1086 (8th Cir.2006) (noting that “some preliminary injunctions are sufficiently akin to final relief on the merits to confer prevailing party status,” whereas others that “merely maintain! ] the status quo do[] not confer prevailing party status”); Dubuc v. Green Oak Twp., 312 F.3d 736, 753 (6th Cir.2002) (concluding that granting a preliminary injunction may confer prevailing party status if the injunction represents “an unambiguous indication of probable success on the merits, and not merely a maintenance of the status quo ordered because the balance of equities greatly favors the plaintiff’ (internal quotation omitted)).
This well-established rule has several advantages. First, it properly focuses the inquiry on whether the plaintiff obtained relief based on the merits of its claims rather than other interim relief factors. Compare PAPV, 520 F.3d at 232-33 (noting district court’s repeated findings of unconstitutionality) with John T. v. Del. Cnty. Intermediate Unit, 318 F.3d 545, 556 (3d Cir.2003) (noting that TRO was merely to preserve status quo so that court could consider the merits of plaintiffs claims).
Second, this rule avoids the concerns voiced in Buckhannon and by the Majority that the catalyst theory is being revived: the test focuses on the nature of the district court’s findings, not the defendant’s response to those findings or its motivations.
Third, this rule promotes judicial efficiency in a significant class of civil rights cases where the plaintiff essentially challenges government policies prohibiting a discreet course of action in the future, such as advertising for a concert or demonstrating in front of city hall. The practical reality in such cases is that a TRO or preliminary injunction that enables the plaintiff to do what it wants to do, ie., advertise for a concert or demonstrate, is often all the relief the plaintiff wants or needs. It may be counterproductive and wasteful of judicial resources to require a plaintiff to insist on a final order that it no longer needs before it can be considered a prevailing party and obtain attorney’s fees.
When the proper test is applied, it becomes clear that the TRO granted to Live Gold provided “at least some relief on the merits of ... [the] claims,” Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835. In PAPV, this Court emphasized that:
(1) the trial court, based upon a finding of a likelihood of plaintiffs’ success on the merits, entered a judicially enforceable order granting plaintiffs virtually all the relief they sought, thereby materially altering the legal relationship between the parties; (2) the defendant, after opposing interim relief, chose not to appeal from that order and remained subject to its restrictions for a period of over two years; and (3) the defendant ultimately avoided final resolution of the merits of plaintiffs’ case by enacting new legislation giving plaintiffs virtually all of the relief sought in the complaint.
520 F.3d at 233.
The result here is substantially similar: the District Court found that Live Gold *238 was likely to succeed on the merits of its claims, it entered a TRO affording Live Gold the most significant relief it sought, the right to advertise and to present the August concert outright, and not as a “tribute.” As a result, the State was “temporarily restrained and enjoined from interfering in any way with live performances by Plaintiffs’ respective groups at the Hilton Hotel in Atlantic City, New Jersey, and the marketing and promotion thereof.” (App.190.) The District Court clearly indicated that it considered the merits of the substantive legal issues during the TRO hearing and granted the TRO in light of its view on those issues:
I think there is sufficient problem with the State’s position so that I — there is a likelihood of success on the merits in this particular case....
[Tjhere may be substantial federal rights being impaired by the action of the State in this case, generally, under the statute ... important federal rights are at issue, both freedom of speech rights under the Lanham Act and private rights to nonregistered trademark — trade name. Consequently, the Temporary Restraining Order will issue.
(App.187-88.)
The District Court’s statement that it will “have an opportunity to get to the merits of this case on September 7th [at the preliminary injunction hearing]” does not nullify its determination on the merits that the August concert proceed as Live Gold requested; it indicates only that the court planned to consider whether Live Gold deserved further relief for future concerts.
In addition, the TRO obtained in this case cannot be characterized as a “stay put” order or relief pendent lite. Rather, in the present case, the District Court’s issuance of a TRO effectively gave Live Gold a complete victory on one important issue in the litigation. The musical groups being promoted by Live Gold — “The Platters” and “The Cornell Gunter Coasters” — were scheduled for a two-week engagement at the Hilton Hotel to begin on August 18. On August 17, the day before the first Hilton concert, Live Gold sought and obtained the TRO preventing the State from enforcing the Truth in Music Act in relation to the performances at issue. By the time Live Gold and the State returned to court on September 7, for a hearing on the preliminary injunction, the concert series had already concluded — and not as a “tribute.” Thus, at that point, the TRO had protected Live Gold from a potential enforcement action by the State, and Live Gold had largely obtained the relief it requested.
In this light, the TRO Live Gold obtained was a functional determination on the merits. It exalts form over substance to claim, as the Majority does, that Live Gold has not succeeded on the merits when what Live Gold wanted to do was to promote and present without interference from the State musical groups for which it held a valid common law trademark. The District Court issued a TRO — clearly premised on the merits of the claims at issue — compelling the State to permit Live Gold to do just that. In this case, Live Gold fits comfortably within “our respect for [the] ordinary language” definition of “prevailing party.” Buckhannon, 532 U.S. at 603,121 S.Ct. 1835.
In addition to the judicial order here, the District Court permanently altered the legal relationship between the parties. The court’s statement that the State would be “bound” by its new interpretation of the Act should bar the State from taking any inconsistent positions in future litigation because of the doctrine of judicial estoppel. Judicial estoppel is an equitable doctrine that entails “ ‘the intrinsic ability of courts *239 to dismiss an offending litigant’s complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from playing fast and loose with the courts.’ ” In re Kane, 628 F.3d 631, 638 (3d Cir.2010) (quoting Krystal Cadillac-Oldsmobile CMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319-20 (3d Cir.2003)). “[T]he basic principle of judicial estoppel ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.” Krystal Cadillac-Oldsmobile, 337 F.3d at 319 (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir.1996)). “Though there is no rigid test for judicial estoppel, three factors inform a federal court’s decision whether to apply it: there must be (1) ‘irreconcilably inconsistent positions;’ (2) ‘adopted ... in bad faith;’ and (3) ‘a showing that ... estoppel ... address[es] the harm and ... no lesser sanction [is] sufficient.’” G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir.2009) (quoting Chao v. Roy’s Constr., Inc., 517 F.3d 180,186 n. 5 (3d Cir.2008)).
Here, once the State had reversed course and accepted that a valid common law trademark must be treated in the same way as a registered trademark, the State would be judicially estopped from adopting a contrary interpretation of the Act in any subsequent judicial proceeding and certainly in any proceeding against Live Gold. This is the significance of the District Court’s statement that the State was “bound” to its new interpretation. Moreover, it showed that the District Court must have relied on this commitment by the State when the court did not enter a permanent injunction against the State. If the State were to assert again that the Truth in Music Act does not recognize valid common law trademarks, it would be asserting an inconsistent position in presumptive bad faith after already having conceded the wrongfulness of such an assertion. Judicial estoppel, therefore, would apply to prevent the State from perpetuating a fraud on the court. See New Hampshire v. Maine, 532 U.S. 742, 751,121 S.Ct. 1808,149 L.Ed.2d 968 (2001) (noting that a court addressing judicial estoppel should consider “whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped”).
In conclusion, we see that the District Court’s binding of the State resulted in “a court-ordered ‘chang[e] [in] the legal relationship between [the plaintiff] and the defendant’ ” necessary to permit an award of attorney’s fees. Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835. In this sense, the State’s voluntary concession and the District Court’s “binding” of the State to that position would prevent the State from taking contrary positions in future litigation; it can be analogized to the voluntary action of a consent decree: in both instances, voluntary conduct formalized by a court results in a material alteration in the legal relationship between the parties.
Moreover, requiring a party to go further than Live Gold did in this case by obtaining a judgment or consent decree would endanger the practical, efficient, and informal resolution achieved by the District Court in this case. I suspect that Live Gold would never have accepted the District Court’s resolution of the case in the way it did if it had it known that it would not be a prevailing party. Live Gold would have insisted on greater judicial formalization of the change in the State’s position, a consent decree, or the like. The Majority’s insistence on a “judgment,” rather than Buckhannon’s broader *240 “judicial imprimatur,” will only unnecessarily drag out cases and lead to judicial inefficiency. The essential question in the prevailing party inquiry is whether the party has obtained a judicial alteration of the legal relationship between the parties. Live Gold certainly accomplished that.
Under these circumstances, an award of attorney’s fees is consistent with Supreme Court precedent, see Buckhannon, 532 U.S. at 603, 121 S.Ct. 1835, and required by this Court’s precedent, see PAPV, 520 F.3d at 232-33.
For the reasons set forth above, I respectfully dissent. I would confer prevailing party status to Live Gold and award it its attorney’s fees.

. The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under *225 28 U.S.C. § 1291.

. Live Gold does not argue that the second resolution, "court-ordered consent decree,” is in play here, nor could it for the reasons discussed below. See infra note 3.

. While Judge Debevoise suggested at the TRO hearing that the State’s interpretation of the law posed "a very serious problem” and recognized "a significant risk there may be substantial federal rights being impaired by the action of the State,” that will be true in almost all of these cases— § 1988 deals with civil rights cases, which typically involve "very serious” and “substantial federal rights.” Judge Debevoise acknowledged that "the State maybe has some merit to its position” (emphasis added), and stated it could resolve the merits "at a later date upon the return day of the Order to Show Cause.”

. Contrary to the concerns expressed by Judge Roth, we do not mean to "cast[] doubt” on the "well-supported legal proposition” that, in some cases, interim injunctive relief may be sufficient to warrant attorney’s fees. We agree that "interim relief remains a proper basis for an award of attorney’s fees when that relief is based on a determination of the merits of the plaintiff's claims.” We emphasize, however, that the determination must be merits-based, like the PAPV Court's decision that the challenged law in that case was unconstitutional, and may not be merely a finding of a likelihood of success on the merits, as in this case.

.Judge Roth argues that the TRO was a "functional determination on the merits” because it "protected Live Gold from a potential enforcement action by the State” and allowed the concert series to proceed without being labeled a “tribute.” Thus, she contends, "Live Gold had largely obtained the relief it requested.” While this has surface appeal, the Supreme Court has told us it is not enough. As we have explained, Live Gold did not obtain a judgment on the merits of its claim. Without that, it is simply not entitled to attorney’s fees.

. We doubt that the consequences of our decision today will be nearly as severe as Judge Aldisert foreshadows. In any event, our job is to follow Supreme Court precedent. Judge Aldisert writes about what the law should be, but we must deal with what the law is.

. Farrar makes clear that the benefit need not be significant. There, the Court held that a plaintiff awarded nominal damages is a prevailing party, because the award "modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.” 506 U.S. at 113, 113 S.Ct. 566.

. Accord McQueary v. Conway, 614 F.3d 591, 596-602 (6th Cir.2010) (opining on whether granting a preliminary injunction may render a party prevailing always, sometimes, or never, and favoring an award when the interim relief indicates probable success on the merits and effects "a lasting change in the legal relationship between the parties”); Lorillard Tobacco Co. v. Engida, 611 F.3d 1209, 1217 (10th Cir.2010) ("[T]o be a prevailing party on the basis of a preliminary injunction requires 'relief on the merits’.... ”); Garcia v. Yonkers Sch. Dist., 561 F.3d 97, 102 (2d Cir.2009) (“the entry of an enforceable judgment, such as a stay or preliminary injunction, may permit the district court to confer prevailing-party status on the plaintiff notwithstanding the absence of a final judgment on the underlying claim”); Common Cause/Ga. v. Billups, 554 F.3d 1340, 1355-56 (11th Cir.2009) (awarding prevailing party status to plaintiffs that had obtained a preliminary injunction, but were later denied a permanent injunction as a result of intervening legislation); Dear-more v. City of Garland, 519 F.3d 517, 524-26 (5th Cir.2008) (noting the absence of Supreme Court authority on point and variety in the circuits’ handling of the issue and applying its own three-part test to find that granting a preliminary injunction conferred prevailing party status); Advantage Media, LLC v. City of Hopkins, 511 F.3d 833, 837 (8th Cir. 2008) (recognizing "a preliminary injunction can in some instances carry the judicial imprimatur required by Buckhannon to convey prevailing party status,” but finding that final judgment in the case before it reversed the effect of the preliminary injunction); Dupuy v. Samuels, 423 F.3d 714, 723, 723 n. 4 (7th Cir.2005) (affirming that a preliminary injunction may justify an award of attorney’s fees based on prevailing party status); Watson v. Cnty. of Riverside, 300 F.3d 1092, 1096 (9th Cir.2002) ("A preliminary injunction issued by a judge carries all the 'judicial imprimatur' necessary to satisfy Buckhannon.”); Race v. Toledo-Davila, 291 F.3d 857, 859 (1st Cir. 2002) (“an individual may be entitled to attorney’s fees without having obtained a favorable final judgment following a full trial on the merits, but he must obtain relief based on the merits of at least some of his claims.”) (internal citations and quotations omitted); but see Smyth v. Rivero, 282 F.3d 268, 274-78 (4th Cir.2002) (expressing doubts as to whether a preliminary injunction may confer prevailing party status); cf. PAPV, 520 F.3d at 232-33, 233 n. 4 (noting that the Fourth Circuit is the "only one arguably dissenting Court of Appeals” (citing Smyth, 282 F.3d at 276-77)).

. The Majority attempts to evade this common-sense conclusion by mistakenly arguing that " 'likelihood' does not mean more likely that than not.” Ante at 229 (citing Hackett v. Price, 381 F.3d 281, 290-91 (3d Cir.2004).) But Hackett was not a preliminary injunction case — it was a habeas case concerning the constitutionality of jury instructions at the penalty phase of a capital case, where the question was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.” Id. at 290. Hackett acknowledged that "[a]s one definition of 'likely' is ‘having a better chance of existing or occurring than not,' Webster's Third New International Dictionary 1310 (1971), someone could plausibly argue that 'reasonable likelihood’ is not a lesser standard than ‘more likely than not.’ ” Indeed, "courts use a bewildering variety of formulations of the need for showing some likelihood of success.” 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.3 (2d. ed.2010).

. We address temporary restraining orders and preliminary injunctions together, as the two share nearly identical factors which courts evaluate in granting such interim relief and, in certain circumstances, have identical legal effect. See Miller v. Mitchell, 598 F.3d 139, 145 (3d Cir.2010). The most significant differences are that temporaiy restraining orders may be issued with little or no notice and may dissolve on their own accord. Id. (discussing Fed.R.Civ.P. 65(b)(2)). Nevertheless, temporary restraining orders, like preliminary injunctions, may touch on the merits of a case to sufficiently alter the legal relationship between parties to confer prevailing party status. See Fed.R.Civ.P. 54(a) (" 'Judgment' as used in these rules includes a decree and any order from which an appeal lies.”); Robinson v. Lehman, 771 F.2d 772, 782 (3d Cir.1985) ("The denial of a temporaiy restraining order is not generally appealable unless its denial decides the merits of the case or is equivalent to a dismissal of the claim.”).